McCANN v. CHICAGO, M. & ST. P. RY. CO.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1901.)

No. 716.

RAILROADS—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE.

Plaintiff was struck by defendant's train while he was standing between two tracks at a crossing waiting to board a work train of another company by which he was employed. The tracks were 7 feet apart, so that when two trains were passing the space between the coaches was only about 20 inches. Instead of remaining in a place of safety, where the other workmen were waiting, he deliberately stepped between the tracks, and remained there, knowing that the trains were approaching, and would meet at the crossing, and that there was no safe standing room between the tracks while trains were passing. *Held*, that it was not error to take the case from the jury, and direct a verdict for defendant on the ground that the evidence showed contributory negligence on plaintiff's part.

In Error to the Circuit Court of the United States for the Northern District of Illinois.

Action by Marquis H. McCann against the Chicago, Milwaukee & St. Paul Railway Company. The case was taken from the jury, and a verdict directed for defendant, and plaintiff brings error. Affirmed.

This action is for a personal injury sustained by the plaintiff in error (plaintiff below), caused by being struck by a train of cars while standing at a crossing on Leavitt street, in the city of Chicago, waiting to board a train on the Pittsburg, Cincinnati, Chicago & St. Louis Railroad on December 13, 1897, by means of which he was thrown to the ground, and his leg crushed by being passed over by the engine of the said train. Leavitt street runs north and south, and at the place where the accident happened it is crossed at right angles with several railroad tracks running east and west. The two most northerly of these tracks are the main tracks of the Galena Division of the Chicago & Northwestern Railway Company. Immediately south of these, and adjoining, are two other main tracks of the first above named road known as the "Pan Handle," but used also by the defendant company. The north track is used for out or west bound trains, and the south track for east-bound trains. Just north of these tracks lie two main tracks of the Chicago & Northwestern Railway Company, and just south extend the switch tracks of the Pan Handle road. These joint tracks are 7 feet apart, so that when two trains are passing upon adjoining tracks the space between the passenger coaches is only about 18 or 20 inches,—too narrow for safety for a person standing between the tracks; and it is evident it was never intended that a person should so stand. These tracks, besides being fenced, had crossing gates maintained on either side, and a flagman stationed there to give warning; so that for a grade crossing it was made as safe as could well be, and as safe as other like grade crossings in the city. For two years prior to this accident the Pan Handle Company had run a work train west over the north joint track above referred to, in the early evening, in order to carry its own employés to and from their places of work along the line of its road. This train did not carry passengers generally, but only employés of the road starting from their round house at Curtis street, and running to the Englewood yards at Sixty-Third street. It carried no passengers, and was not put in for that purpose. It ran on a schedule as No. 42 of the time-card issued by the superintendent of terminals controlling the operation of the joint tracks between the Union Depot and Western avenue in the city. It was not scheduled to stop at Leavitt street, but had been accustomed to do so every evening to accommodate the workmen of that road residing near the crossing. There was no depot there, nor any platform, but simply an ordinary street crossing, planked as such like those over the other highways in the city. The joint time-table shows that no train was scheduled

to stop at this crossing, and none did so in fact except this work train, which had been accustomed to stop to pick up the employés of that road who wished to go west to their work. About the same time in the evening the defendant's Pioneer Limited train of empty sleepers, coaches, and baggage cars was regularly backed east upon the adjoining track to the Union Depot to go out on its run to St. Paul. It was scheduled upon the joint time-card as coach train No. 1, and its time was 15 minutes from Western avenue to the Union Depot, a distance of three miles. These two trains—one on the Pan Handle, the other on the defendant's road—usually met, as they did on this evening, at or near Leavitt street. The plaintiff was a flagman at Fifty-Ninth street for the Pan Handle Company. He lived northwest from the place of the accident, and for 15 months had been accustomed to take this work train at Leavitt street to go to and from his work. On the evening of the accident he reached this crossing about 10 minutes before train time. His relation of the accident is this: "On this night I turned south on Leavitt street. Was waiting at the railroad tracks with the rest of the men to take the work train out to Fifty-Ninth street. Waited at crossing about 10 minutes. The train was about on time, and due there at 5:40. I was waiting on the north side of the joint main tracks. When I saw it, I think the work train was about 80 feet east of the east sidewalk on Leavitt street, but slowed up when she saw I was between the two tracks,—just as she got about to the east sidewalk. In the meantime I went across, so as to get on the south side of the car as she pulled over the crossing, to save the rush, because she only stopped a minute there to let us on, and I thought I would have a better chance to get on, being an old man, about 59 years, at the time of the accident. After I stepped over there, I waited, and saw both trains were approaching pretty close on to me. After I crossed over to the south, I stopped between the two tracks as near the middle of the crossing as could be. I saw the St. Paul train backing up when she was about 40 feet from me. Seeing the other train coming up, I tried to gauge myself as near as I could in the center of the two tracks, so as not to get hurt. I saw the St. Paul train was coming pretty fast. The Pan Handle engine was about the same distance east from me. As the first Milwaukee coach passed me, I turned around to see if I could catch hold of the hand rail of that car. I found she was going too fast for me, and I could not catch it. I wanted to catch hold of the rail of the St. Paul coach in order to get to the rear end of the work train to avoid getting hurt by either one of them. I saw she was going too fast, and I could not do it. Then I turned around, and, just as I turned, it struck me in the shoulder. I faced right north, fell over against the Pan Handle engine, and struck my head against it. The second coach of the St. Paul struck me on the left shoulder, and knocked me over against the Pan Handle engine. I knew just what was up at the time. Of course, I was knocked senseless, but regained consciousness when I found the driving wheel was on my foot. They took me out and to the County Hospital, where they cut off my leg about eight inches below the knee. I used to go there every night and take that train for about fifteen months. There were about twelve or thirteen workmen there that night. There was only one car in the work train. The speed of the St. Paul train was about twenty miles an hour. To the best of my judgment at the time, it was impossible for me to get across the track the St. Paul train was on after I saw the train. I was in the middle of the two main tracks." On cross-examination he says: "I did not pay any attention to know whether the workmen standing there were yelling to me or to some one else. I had come to this crossing and had taken this work train there every night for fifteen months before the accident. I got there that night about ten minutes before the train came. I stood on the north side of the Pan Handle tracks. There were some other workmen who were standing on the same side with me, to take the train. I noticed the Pan Handle work train coming from the east, and thought I would go over to the south side of the car as she pulled up to the crossing, so as to have more room to get on the train when it did stop there. I went over to the south side, between the two joint tracks, for that purpose. I did not remain on the side where the rest of the workmen got on. I went over to the south side alone. When I went over to the south side, the Pan Handle engine was just east of the east sidewalk on Leavitt street and the St. Paul train was close

to the crossing on the west side of it. They were about equal distances apart when I crossed over to the south side. I think, if anything, the St. Paul was nearer. Before I crossed over, I did not look to the east nor to the west. After I had got over, and between the tracks, then I looked, and saw both trains coming. The gates were down at that time. When I got between the tracks I was alone in there, and all the other workmen were on the other side. Could not swear whether there were lights on the rear end of the Milwaukee coaches, because I did not notice them. The east end of the Milwaukee coaches reached me first, because the Pan Handle train slowed up so. The second coach is where it caught me. The Milwaukee coach got to me before the Pan Handle engine did. · The second coach hit me. I think it was the side of the coach that hit me. The Milwaukee train never stopped. I do not know whether I touched the handle of the coach or not. I either turned around or whirled around in such a way that my left shoulder was struck. I have been quite deaf about twenty years. The trains met where they usually did." At the close of the testimony, on motion of defendant's counsel, the court took the case from the jury, and directed a verdict in favor of the defendant, on the ground that the evidence on the part of the plaintiff showed contributory negligence on his part. It is to reverse that direction of the court below that this writ of error is brought.

Frank B. Grover, for plaintiff in error.

Charles B. Keeler, for defendant in error.

Before WOODS and GROSSCUP, Circuit Judges, and BUNN, District Judge.

Upon the foregoing statement of the facts, BUNN, District Judge, delivered the opinion of the court.

The facts are mainly conceded. The case rests upon the plaintiff's testimony as given in the statement of facts. There is a material conflict in the testimony as to which coach struck the plaintiff; three witnesses on the part of the defendant testifying that he was not struck by a coach of the defendant's train, but was struck by a coach of the Pan Handle train. But that is quite immaterial according to the view we have taken of the case. We think, upon the plaintiff's own statement of his case, the direction of the court was right, and fully supported by the evidence. Indeed, we think the court might have made the grounds of its decision still broader, and held: First, that the negligence of the plaintiff was the proximate cause of the injury, and, second, that the testimony showed no negligence or want of proper foresight and caution on the part of the defendant company or any of its officers or employés. The situation and the running and operating of these trains at this crossing were well known to the plaintiff. From his own statement he knew all about them. He had taken the same Pan Handle train every day for 15 months. He knew the trains were expected to meet at that time and place, and that there was no safe standing room between the tracks. He went deliberately into a place of imminent danger, without so much as looking to the east or west to see if the trains were coming, and re-mained there until the trains came, knowing well that there was not safe standing room between the tracks. The evidence shows that he was warned by other workmen to cross back over the tracks, but that he paid no attention to the warning. Knowing the situation as he did, it was negligence to cross over the tracks and remain between them until the trains came. It was, no doubt, possible, after he saw the trains coming, by the exercise of good judgment in an

emergency, to have escaped the peril, either by standing still flatwise upon the 18 or 20 inches space that he had between the tracks, and making no effort to get hold of the handles upon the coaches of the Milwaukee train; or, what would perhaps have been better still, to have thrown himself flat on the ground lengthwise between the tracks and allowed the trains to pass over him. Still he might be excusable for not exercising the best judgment in such an emergency when the peril was full upon him. But he was not excusable for voluntarily putting himself in and remaining in a position of such imminent danger without any sufficient reason. And no doubt the jumping to catch hold of the handle of the car while under motion was itself a danger and a peril in the circumstances. He was not a passenger on the defendant's road, and as a passenger that company owed him no duty. Indeed, he was not a passenger upon the Pan Handle road, though that question is not material here, but was, while going upon its train to and from his work on the line of that road, its workman and employé. Elwald v. Railway Co., 70 Wis. 420, 36 N. W. 12, 591. He knew the speed of the defendant's trains at that point, and that it did not stop at Leavitt street crossing. That company did not owe him the usual duty owing to a passenger upon its road. It was, no doubt, under obligation to do all it could to prevent injury after its officers and employés in charge of the train were cognizant of the plaintiff's peril. But there is no evidence that this was not done. The defendant had no station or stopping place at that point. The ordinance of the city allowed trains a speed of 20 miles an hour. There is no evidence tending to show that the defendant's train was running at a higher rate of speed. On the contrary, the evidence shows the train to have been going at from 12 to 16 miles an hour.

There are several grounds of negligence alleged, but the one mainly relied upon was the speed of the defendant's train. But there is no evidence of negligence in this respect, or in any other respect. Another ground of negligence alleged was the lack of train lights, but no case is made under this head; the evidence without conflict showing that the rear or east end of the backing train was furnished with a large bulls-eye reflector 10 to 12 inches in diameter, throwing a continuous red light, and placed at the outer edge of the platform in the center of the vestibule. By it stood a white hand lamp, and on each side of the coach, at the end, hung a small red lamp or "marker." All these lights were burning that evening, and were plainly seen 150 to 200 feet from the crossing by several witnesses, and also by the engineer and fireman of the Pan Handle train two blocks away from them. But the lights were of no use to the plaintiff, as he says he did not look to the east nor to the west. If he had said he was 59 years old, and did not greatly care longer to live, his words would have corresponded fairly well with his actions in going into such a place of peril without so much as looking in any direction for danger, and remaining after he saw the peril was upon him. If he could not hear, he was under all the more obligation to use the senses he had. In any case it was his duty to have looked all ways for danger. Houston v. Railway Co., 95 U. S. 697, 24 L. Ed. 697; Schofield v. Railway Co., 114 U. S. 615, 5 Sup. Ct. 1125, 29 L. Ed. 224; Railroad

Co. v. Freeman, 174 U. S. 379, 19 Sup. Ct. 763, 43 L. Ed. 1014; Walker v. Kinnare, 22 C. C. A. 75, 76 Fed. 101; Blount v. Railway Co., 9 C. C. A. 526, 61 Fed. 375; Stowell v. Railroad Co., 39 C. C. A. 145, 98 Fed. 520; Neininger v. Cowan, 42 C. C. A. 20, 101 Fed. 787; Gilbert v. Railroad Co., 97 Fed. 747, 38 C. C. A. 408; Railroad Co. v. Peebles, 14 C. C. A. 555, 67 Fed. 591; Pyle v. Clark (C. C.) 75 Fed. 644. If precedents were needed upon so plain a proposition, all of the above cases are authority in point for the action of the court below in directing a verdict in favor of the defendant on the ground of contributory negligence. Knowing the situation as the plaintiff did, it was negligence per se to stand between the tracks while the trains passed. Beach, Contrib. Neg. (3d Ed.) § 216; Moore v. Railroad Co., 108 Pa. St. 349; McGeehan v. Railroad Co., 149 Pa. St. 188, 24 Atl. 205; McClary v. Railroad Co. (C. C.) 46 Fed. 343; Bjork v. Railroad Co., 85 Ill. App. 269; Cunningham v. Railroad Co. (C. C.) 17 Fed. 886. As was said by the supreme court, speaking through Mr. Justice Miller, in Ellicott v. Railway Co., 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068:

"But one explanation of his conduct is possible, and that is that he went upon the track without looking to see whether any train was coming. Such omission has been again and again, both as to travelers on the highway and employés on the road, affirmed to be negligence. The track itself, as it seems necessary to iterate and reiterate, is itself a warning. It is a place of danger. It can never be assumed that cars are not approaching on a track, or that there is no danger therefrom."

In the case at bar the plaintiff not only went upon the track without looking, but he remained there for 10 minutes waiting for trains that he expected and had every reason to believe would come, and this while he could have remained with the other workmen on the other side of the tracks in perfect safety. It is not necessary to multiply authority upon the question.

Upon the question of the negligence of the defendant company there was nothing upon which a verdict could have been based. Each and all the grounds relied upon failed in the proof. The crossing was properly guarded, and the crossing gates down. The speed of the train was not excessive or unlawful. The train was properly lighted. The engine had an automatic bell ringer, which was always ringing when the engine was in motion, and was ringing that night on the occasion in question, and the gateman's bell was ringing constantly, the flagman upon the crossing calling out a verbal warning when the train was approaching and while it was 200 feet away, with the plaintiff standing only 10 feet from him. In addition to these things, an air whistle or "tail hose" whistle on the rear end of the backing train was sounded, and it was not the company's fault that the plaintiff could not hear. It is quite evident, however, from his own testimony that it would have made no difference if he had heard it, as his deliberate purpose was to get away from the crowd, and to board the train on the south side, from between the tracks. Indeed, it is difficult to see what the defendant company could have done that was not done to prevent such an accident. The judgment of the circuit court is affirmed.